## In re CENTRAL WEST PUBLIC SERVICE CO.
### No. 1067.

District Court, D. Delaware.
July 24, 1936.

Marvel, Morford, Ward & Logan, of Wilmington, Del., for debtor.

Ross & Watts, of Chicago, Ill., and Harold B. Howard, of Wilmington, Del., for reorganization committee.

E. Ennalls Berl (of Ward & Gray) of Wilmington, Del., for trustees.

Howard Duane, of Wilmington, Del., for Albert E. Pierce.

Wilson & McIlvaine, of Chicago, Ill., and Hugh M. Morris, of Wilmington, Del., for First Nat. Bank of Chicago and for John C. Mechem.

NIELDS, District Judge.

March 12, 1934, equity receivers were appointed for Central West Public Service Company by the chancellor of Delaware. Ancillary receivers were appointed by federal courts in various jurisdictions in which the directly owned properties of the company were located. At this time the company had outstanding first lien collateral gold bonds, series A, B, and C, amounting to $10,265,000. Debentures, notes, and unsecured claims consisting of 10-year convertible 6 per cent. debentures, three year 7 per cent. gold notes, and a small amount of other unsecured claims aggregated in all $2,538,650.59. Preferred stock, series A and B, aggregated in par value $2,157,400, with fractional warrants for $38,747.50 in principal amount of series B preferred stock. There was outstanding 88,896 shares class A common stock and 200,000 shares of class B common stock. Interest on bonds, debentures, and notes was in default. The debtor was in arrears on its preferred stock. About 10,000 persons held securities of the debtor.

The properties of the debtor were telephone, electric, and a small number of gas, water, and ice companies. Some were owned directly, and others through subsidiaries. The properties were located in ten states. All properties directly owned were subject to the lien of the indenture securing the first lien collateral bonds. All capi-

tal stocks and first mortgage bonds of subsidiary companies were pledged as security for the bonds of the debtor with the exception of the stock of Iowa-Illinois Telephone Company, whose bonds were held by the public. The properties of the debtor were carried on its book at approximately $22,000,000. The Stone & Webster Engineering Company report gives the approximate reproduction cost at $15,000,000, without including any organization expense or cost of financing.

In April, 1934, a reorganization committee was formed consisting of Messrs. Ward, Stark, Freeman, Gallagher, and McGraw. McGraw had been chairman of the board of directors. The other members had been requested to serve by holders of substantial amounts of securities. Ward was chosen chairman of the committee. Ross and Watts of Chicago were selected as counsel. An office was opened by the committee in Chicago. Meetings of the committee were held in April and May, 1934, and the committee instructed its counsel, Ross and Watts, to prepare a petition and file the same in Delaware immediately upon the passage of section 77B of the Bankruptcy Act (11 U.S.C.A. § 207). June 8, 1934, the petition was filed, and this court appointed Darling and Berl as trustees. Theretofore they had served as equity receivers.

After a thorough study of the company's situation, the committee obtained leave of this court to employ Stone & Webster Engineering Corporation to make an engineering survey of the company's properties and to employ Arthur Anderson & Co. to make an audit of its financial affairs. Ward, chairman of the committee, made a trip of inspection of the principal properties and reported to other members on the properties the management and its position in the territories served.

The necessary data having been supplied, in September, 1934, the committee began to formulate a plan of reorganization. Various members had prepared tentative outlines of a plan. Many meetings were held. December 5, 1934, the first printed proof of a plan was prepared. There were 19 complete revisions as the result of consideration and work of the committee and of its counsel. The intricacies of the questions the committee was called upon to determine are indicated by the plan itself. Each member was faithful in his attendance at meetings, and each contributed in-

telligently to the plan. At each meeting the current draft was read paragraph by paragraph and discussion had and alterations made until the final draft. This committee was the sole committee working upon the plan. Before it was submitted in final form, holders of substantial amounts of the various classes of securities were given an opportunity to consider and criticise the plan. This resulted in many conferences and discussions, although no fundamental changes resulted.

The plan of reorganization reduced the fixed charges of the debtor from $760,000 to $179,000 annually. That the committee was able to accomplish this reduction is indicative of the confidence placed in it by the security holders. The plan has a number of original features showing the character of the work of the committee and of its counsel. For example, the new operating company is not a holding company, but directly owns a large part of its properties. The only properties operated through a subsidiary are those in the state of Virginia made necessary by the local law preventing a foreign corporation from owning utility properties in Virginia. If expansion of the company in the future is advisable, this has been made possible through the type of first mortgage placed upon the properties. Upon investigation it was found that some properties were operated at a loss and had little prospect of improvement. These properties were segregated into a different company and marked for liquidation. The new company has a sound financial structure, and is relieved from properties which were draining it. In the terms of the new securities there are original features. In lieu of a straight sinking fund provision a bond retirement fund was devised under which the company is not obliged to make fixed payments to the fund, but under which certain payments must be made before any dividends can be paid upon the common stock. Restrictions have also been placed upon the issuance of additional bonds. Many additional features of the plan and of the capital structure of the new company are original.

There were 10,000 holders of securities and about 400 security dealers interested in the situation. Printed communications were sent out by the committee to such persons. The preparation of these communications was a matter of detailed consideration by all members of the committee. They were the subject of committee meet-

ings and passed through several proofs. The chairman of the committee carried on voluminous correspondence with interested persons. The committee office was open at all times and there were many conferences there and elsewhere.

The plan of reorganizaton as originally adopted made no provision for the holders of common stock. The court referred to a master the issue as to the value of such stock. The order of reference was later amended to include the question of solvency or insolvency. Members of the committee attended the hearings before the master. The master reported that the company was insolvent and the common stock had no value. After considerable negotiation an amendment was made allocating to class A common stock a small amount of the common stock of the new company.

Courts should consider (1) what was accomplished; (2) the time and effort required; (3) the ability of the members of the committee; and (4) the capacity of the company to pay. The plan was fair and provides a sound financial and operating structure for the new company. This committee solicited deposits by the holders of securities of all classes. In most situations there are at least three committees; one representing lien holders, another representing unsecured debt, and a third representing stockholders. Each committee has counsel and must incur expense. The confidence of security holders in this committee prevented the organization of additional committees. The saving thus effected should be taken into account. There will be allowed the reorganization committee $45,000, divided as follows: $15,000 to Pierce C. Ward, its chairman; and $10,000 to Edward M. Stark, W. C. Freeman, and J. B. Gallagher each. Expenses of $88,456.35 will be allowed.

Ross and Watts were the only counsel engaged in the reorganization of the debtor. Petitioners' work fell into 14 classifications. In April, 1934, at the first meeting of the reorganization committee, petitioners were engaged as counsel for the committee. Many questions of law were investigated. Necessary data was furnished to the committee. Pursuant to instructions of the committee, petitioners prepared a petition under section 77B and caused the same to be filed in this court June 8, 1934.

The first important matter for counsel of the committee was the reorganization of Iowa-Illinois Telephone Company, a sub-

sidiary of the debtor with $704,000 of outstanding bonds. This reorganization was effected. As a result, the debtor was able to retain its equity in the subsidiary and to keep it as a part of the operating organization. The federal court of Iowa allowed petitioners $2,000 in connection with this reorganization. The most important work of counsel to the committee was preparing the plan of reorganization in collaboration with the committee. Petitioners were intensively engaged in this work from September, 1934, to March, 1935. Thirty meetings of the committee were held during this period. Counsel were continuously engaged in working out agenda, considering questions of law, and preparing revisions of the plan. After preparation of the plan it became necessary to obtain the court's approval of certificates of deposit.

The next matter was preparing proof before the special master with respect to the value of class A and class B stock, and with respect to insolvency. Engineering and accounting exhibits were prepared for these hearings. Testimony of auditors and engineers was introduced. A number of hearings were held of several days' duration. Briefs were filed by petitioners. The special master upheld the contentions of the committee and its counsel. The holders of class A stock indicated their intention of taking an appeal from the findings of the special master. After extended negotiations a compromise was effected resulting in the issuance of additional shares of common stock. For each 4 shares of class A stock one share of new common stock was issued resulting in a total additional issue of 22,000 shares of common stock. Preliminary hearings were held before utility commissions of the states of Minnesota, Nebraska, North Carolina, North Dakota, and West Virginia. At each the plan was discussed and preliminary approval of the commissions obtained.

Having obtained the necessary percentage of assents to the plan the committee presented to the court proof of its fairness and feasibility. After hearings, the court approved the plan as fair and feasible. Hearings were again held before the various state commissions and their approval obtained. After obtaining the order of confirmation, petitioners prepared the various documents to carry the plan into effect. All necessary papers and documents to that end were prepared by petitioners. They were numerous and complicated.

The first mortgage collateral lien indenture comprises over 200 pages, and many of its terms and provisions are intricate. Another document requiring considerable thought was the bond trust agreement. It was necessary to provide for the issuance of certificates representing fractional interests; the actual bonds being deposited with the depositary under the trust agreement. Seventeen different kinds of certificates were prepared to conform to the requirements of the New York and Chicago Stock Exchanges. Fifteen different types of letters were prepared advising security holders that the new securities were ready for delivery.

Ross and Watts, as attorneys for the reorganization committee, will be allowed $45,000 and expenses of $1,186.96.

Darling and Berl served as trustees for two years. The affairs of the debtor were administered by them. Petitioner Darling was located at the general office of the debtor in Sioux City, Iowa. From an operating standpoint the affairs of the debtor were directed by Darling, although he conferred on all major problems with his co-trustee and conducted an extensive correspondence with him. Darling gave his entire time to the affairs of the debtor. Accordingly, the court authorized for him a drawing account of $1,000 a month. With their counsel petitioners made two extensive trips visiting a portion of the properties of the debtor and of its subsidiaries. Darling also made other trips of inspection. The properties of the debtor consist of 209 separate telephone exchanges, 58 separate electric distribution systems, 2 separate gas distribution systems, 1 water system, 2 artificial ice systems, and 1 natural ice system. The trustees administered these properties with eminent success, as demonstrated by the results.

Following the appointment of the trustees the reorganization committee invited them to a conference held in Chicago. The views of the committee were thoroughly discussed with the trustees and their counsel. The measure of co-operation between the trustees and the reorganization committee is indicated in the testimony of the chairman of the committee: "We discussed the plan of reorganization with the trustees. They had nothing to do with the preparation of the plan—I will make one exception, Mr. Logan made a very helpful suggestion on one occasion in Chicago in the distribution of securities to the old

774

preferred stockholders, and we conferred with the trustees when the plan was prepared, because we naturally wanted the co-operation of the trustees, that is, to have the trustees believe that our plan was a sound and workable plan."

The trustees attended a conference in Chicago with the reorganization committee upon the question of approving the plan of reorganization of the Iowa-Illinois Company, and they approved such plan.

■ The trustees urge that their allowances should have a reasonable relation to the results achieved. They argue that it is logical to balance their requested allowances against such results. As representatives of the court in the administration of the properties of the debtor, their compensation must be based upon the value of the actual services appropriately rendered. Formulating and promulgating a plan of reorganization was the task of the reorganization committee and its counsel. With that task the trustees had little or nothing to do. Their job was to operate the properties and the court is restricted in allowing compensation to that service only.

■ In addition to the $7,500 heretofore allowed, an additional sum of $10,000 will be allowed to each trustee.

■ Marvel, Morford, Ward, and Logan acted as general counsel for the trustees of the debtor from June 11, 1934. They secured possession of properties of the debtor from the receivers in five jurisdictions. The services of petitioners included daily legal advice to the trustees; passing on conditional sales contracts used in selling appliances; settling 1929 tax assessments of $107,965.16 for $5,186.19; handling Chenowth Bros., suit in Dallas, Tex. They prepared all petitions, reports, and orders filed by the trustees, totaling 84. They prepared a petition for instructions filed October 23, 1935, and a petition for an injunction filed November 29, 1935, each relating to the Public Utility Act. They advised the trustees concerning their duties. They examined all claims and proofs of interest filed by creditors and stockhold-

ers. They prepared 33 exceptions, all of which were sustained except one, which was withdrawn. They effected savings of franchise taxes; they saved income taxes and transfer taxes; they recorded the decree appointing the trustees in 49 counties. In their brief applicants state: "The trustees and their counsel, the applicants, from the beginning, conceived it to be their duty and function to do all things in their power to aid in perfecting a fair and feasible plan of reorganization." What the court has heretofore said respecting the duty of the trustees in this matter applies with greater force to their counsel. Formulation of the plan of reorganization devolved upon the reorganization committee and its counsel. Any participation on the part of the trustees and their counsel was voluntary and unnecessary, and cannot be the basis of an allowance.

These applicants have been paid $7,500. An additional allowance of $12,500, making a total of $20,000, will be allowed.

The further applications for allowances do not require detailed consideration. The following allowances will be made:

| | |
|---|---|
| Harold B. Howard, local attorney for reorganization committee | $ 500.00 |
| Crofoot, Fraser, Connolly & Stryker, attorneys for reorganization committee at Omaha | 250.00 |
| Expenses | 50.71 |
| Cobb, Hoke, Benson, Krause & Faegre, attorneys for reorganization committee at Minneapolis, | 250.00 |
| Fisher, Boyden, Bell, Boyd & Marshall, special counsel for reorganization committee at Chicago, | 450.00 |
| First National Bank of Chicago and John C. Mechem, co-trustees, | 7,846.43 |
| Wilson & McIlvaine, attorneys for First National Bank of Chicago, and John C. Mechem, co-trustees, | 1,000.00 |
| Hugh M. Morris, attorney for First National Bank of Chicago, and John C. Mechem, co-trustees, | 250.00 |
| Howard Duane, attorney for Albert E. Pierce, class A and B stockholder, | 750.00 |
| Gold & McCann and Russell Jackson, attorneys for class A stockholders, | 1,500.00 |
| Albert E. Pierce, owner of class A and class B stock, expenses, | 3,725.94 |
| Gamble, Read & Howland, Des Moines, Iowa | 0.00 |

An order may be submitted.