GREENSFELDER et al. v. ST. LOUIS PUBLIC SERVICE CO. et al.

Nos. 11661–11664, 11668–11670.

Circuit Court of Appeals, Eighth Circuit.

July 24, 1940.

Rehearing Denied Aug. 17, 1940.

Writ of Certiorari Denied Dec. 23, 1940.

See 61 S.Ct. 396, 85 L.Ed. ——.

Bernard Greensfelder, Forrest M. Hemker, George T. Priest, Robert E. Moloney, Thomas S. McPheeters, Robert H. McRoberts, W. Frank Carter, Harold R. Small, Samuel W. Fordyce, Joseph R. Long, Greensfelder & Hemker, Boyle & Priest, Bryan, Williams, Cave & McPheeters, Carter & Small, and Fordyce, White, Mayne, Williams & Hartman, all

of St. Louis, Mo., on general brief of appellants.

Robert H. McRoberts, of St. Louis, Mo., presented general argument for appellants.

Forrest M. Hemker, of St. Louis, Mo. (Bernard Greensfelder and Greensfelder & Hemker, all of St. Louis, Mo., on the brief), for appellant Edward Greensfelder.

George T. Priest, of St. Louis, Mo. (Boyle & Priest, of St. Louis, Mo., on the brief), for appellant Robert E. Moloney.

Robert H. McRoberts, of St. Louis, Mo. (Thomas S. McPheeters and Bryan, Williams, Cave & McPheeters, all of St. Louis, Mo., on the brief), for appellant Rhodes E. Cave.

Robert B. Caldwell, of Kansas City, Mo., for appellant Samuel A. Mitchell.

Harold R. Small, of St. Louis, Mo. (W. Frank Carter, William T. Jones, and Emmet T. Carter, all of St. Louis, Mo., on the brief), for appellants W. Frank Carter and others.

Hyman G. Stein, of St. Louis, Mo., pro se.

S. W. Fordyce, of St. Louis, Mo. (G. T. Priest, Frank E. Williams, Joseph R. Long, Boyle & Priest, and Fordyce, White, Mayne, Williams & Hartman, all of St. Louis, Mo., on the brief), for appellant Frank O. Watts.

T. E. Francis, of St. Louis, Mo. (O. P. Owen, B. G. Carpenter, and T. E. Francis, Jr., all of St. Louis, Mo., on the brief), for appellees St. Louis Public Service Co. and Henry W. Kiel, Trustee, St. Louis Public Service Company, debtor.

Edgar H. Wayman and Harold C. Hanke, both of St. Louis Mo., on the general brief for appellee City of St. Louis.

Before WOODROUGH and THOMAS, Circuit Judges, and BELL, District Judge.

WOODROUGH, Circuit Judge.

Edward Greensfelder, and other attorneys and individuals who filed claims for compensation for services rendered in the reorganization in bankruptcy of the St. Louis Public Service Company, appeal from the final decree rendered on the claims. Appeals have been taken severally but they present some issues of law which are common to several appeals and which have been presented in one brief for appellants and an answer brief for appellees. We consider them first.

The St. Louis Public Service Company is a utility corporation engaged in the business of furnishing transportation facilities in and about the City of St. Louis, Missouri. Its assets used and useful in this service were valued at $66,000,000 in January, 1927, by the Missouri Public Service Commission; its other assets not so used or useful were then valued at $1,200,000. The Company went into federal court receivership on April 15, 1933, at which time the book value of its property and assets was $73,000,000. The Company serves an area of some 110 square miles and a population of some 1,000,000 persons. At the time of the receivership it owned about 1,330 street cars, 176 trailers and 212 work cars, and operated over about 457.19 miles of tracks. In addition, it operated 93 motor buses and was under contract to purchase corporate stock which would give it control of other buses and bus lines and a monopoly of transportation by street car and bus in St. Louis. The capitalization, funded and other indebtedness of the Company on April 15, 1933, is given in the following table:

| United Railways Company of St. Louis First General Mortgage Four Per Cent Gold Bonds, due July 1, 1934 (hereinafter referred to as "United Railway 4's"), $35,075,000 held as follows: | |
| --- | --- |
| Outstanding in the hands of the public | $17,894,000.00 |
| Pledged to secure 6% Collateral Bank Loan (The validity of this pledge was disputed, but finally upheld)..... $16,626,000.00 | |
| Pledged to secure appeal bonds ................... 437,000.00 | |
| Held in Treasury of the Company .....:......... 118,000.00 | |
| City and Suburban Public Service Company First Mortgage Sinking Fund Gold Bonds, 5% Series A, due July 1, 1934 (hereinafter referred to as "Suburban 5's"): | |
| Outstanding in the hands of the public | 3,263,000.00 |
| St. Louis Public Service Company Five Year Six Per Cent Convertible Gold Notes (hereinafter referred to as "Convertible Gold Notes"): | |
| Outstanding in the hands of the public | 2,448,875.00 |
| Florissant Construction, Real Estate and Investment Company First Mortgage Real Estate 5½% Notes (hereinafter referred to as "Florissant Notes") (Guaranteed by St. Louis Public Service Company): | |
| Outstanding in the hands of the public | 541,000.00 |
| Collateral Bank Loan originally in the principal amount of $10,000,000 (hereinafter referred to as "Ten Million Dollar Bank Loan") (This loan was secured by a pledge of $16,626,000 par value of United Railway 4's, the validity of which pledge was subsequently disputed, litigated, and finally upheld)............. | 9,499,653.53 |

| | | |
|---|---|---|
| Tort Creditors' Claims (as finally allowed) ............................ | | 2,229,274.75 |
| General Creditors' Claims (as finally allowed) ............................ | | 56,805.73 |
| $7 Cumulative Preferred Stock, no par value, stated value $100 per share: Outstanding in the hands of the public, 70,848 shares of the stated value of .................................... | | 7,084,800.00 |
| Held in Treasury, 2,482½ shares of the stated value of ................ | 248,250.00 | |
| Common Stock, no par value, stated value $30 per share: Outstanding in the hands of the public 343,620¹⁵⁄₁₈ths shares of the stated value of .......................... | | 10,308,625.00 |
| Held in Treasury, 500 shares of the stated value of ................ | 15,000.00 | |
| Total .......................... | | $53,326,034.01 |

The Public Service Company acquired its properties in 1927, when mortgages on the predecessor company, United Railways Company of St. Louis, were foreclosed. This foreclosure left outstanding certain first mortgage bonds, United Railways 4's, which had been formerly issued from time to time under an indenture executed in 1899 to the St. Louis Union Trust Company as trustee. The Reorganization Plan of 1927 contemplated issuance of a Supplemental Indenture extending this first lien to 84% of the property to be acquired through reorganization. Other street railway property was acquired at that time from another company, the City and Suburban Public Service Company, and taken subject to the liens upon it, particularly the mortgage securing the Suburban 5's, an issue of that company which was preserved by issue of a Supplemental Indenture preserving and assuming existing obligations. Some 96 miles of single track street railway lines, 57 miles of which were in St. Louis County, the balance in the City of St. Louis, and certain franchises, were covered by this indenture. Interest on the Suburban 5's had been paid up to the date of the commencement of the receivership. Interest on the United Railways 4's had likewise been paid up to the date of the receivership, and these bonds also matured on July 1, 1934.

At the time of the reorganization in 1927 Convertible Gold Notes were issued in the amount of $2,448,875; these obligations were unsecured and were originally due January 1, 1933. All but some $35,000 of the notes had been extended to July 1, 1934, and the interest had been paid thereon to January 1, 1933. There were also outstanding at the time of the receivership

certain real estate notes secured by mortgage on property not used or useful in the operation of street railway business. These notes, obligations of the Florissant Construction, Real Estate and Investment Company, called the Florissant notes, were paid off from time to time and eventually retired.

A $10,000,000 bank loan was outstanding at the time of the receivership, and this also was made in furtherance of the 1927 reorganization. Bank loans were then outstanding in the amount of $4,100,000 secured by $6,000,000 principal amount of United Railways 4's. This loan and adjusted interest thereon was paid off in the $10,000,000 bank loan transaction, and $5,400,000 of the loan was used by the reorganized company to take up $9,000,000 principal amount of United Railways 4% bonds from holders who were willing to accept an offer to take $600 cash and $275 Convertible Gold Notes for each $1,000 bond. The balance of some $400,000 was paid in cash to the reorganized company. At the time of the 1927 reorganization there was a plan to refund the $10,000,000 loan by issuing securities which would not only take up this loan but also provide for the obligations falling due in 1933 and 1934. But due to delay in confirmation of a petition to secure an advance in fares, and due to the depression of October, 1929, no new issues were floated, and the $10,000,000 loan was renewed from year to year. The banks did not secure possession of the $9,000,000 bonds repurchased, but they were given an additional $1,626,000 of United Railways 4's as additional collateral for the loan when market value of the 4's fell from 85¢ to 15¢ on the dollar. The Mercantile-Commerce Bank and Trust Company desired its share of the $10,000,000 loan separately issued and it secured a note for $700,000, its share. This note and the note for the balance of the $10,000,000 were due on demand, or if no demand were made, on June 1, 1933. Payment was called April 12, 1933, and on this day the several St. Louis banks applied on account of the notes a total of $500,346.47, which was on deposit with them. The receivership proceedings followed on the 15th.

The other claims were those of tort creditors and claimants who obtained allowance of claims arising during the operation of the St. Louis Public Service Company prior to the receivership, amounting in the aggregate to $2,229,269.55. As of December 31,

1932 the Company carried a reserve of $2,220,694.51 on account of tort creditor claims. General creditor claims were allowed in the amount of $56,805.73. Taxes due to the State, County and Municipalities totaled $657,080.15; taxes were assessed by the Commissioner of Internal Revenue for the United States in the amount of $677,987.57. The Company was also under obligation to complete purchase of the St. Louis Motor Coach Corporation whose assets were worth Two Million Dollars, on which purchase a balance of $1,226,612.76 was due October 1, 1933. The stock of the Florissant Company was pledged for performance of this contract as were also $201,000 of its unsecured notes.

The stock of the Company consisted of 70,848 no-par value preferred, each share entitled to cumulative dividends of $7.00 per year, and 343,620 and a fraction shares of no-par value common; the preferred had a stated value of $100 a share, the common $30. The consolidated balance sheet of the Company and its subsidiaries as of December 31, 1932, showed a capital surplus of $15,195,539.58, a surplus from repurchase of bonds of $2,639,529.12, and an operating deficit of $822,383.26, or a net surplus of $17,012,685.44. To meet its obligations the Company had on hand, at the inception of the receivership, cash and receivables:

| | |
|---|---|
| Cash on hand and on deposit | $204,342.46 |
| Due from agents, conductors and employees | 46,627.07 |
| Accounts receivable (less reserve) | 87,001.44 |

Westinghouse Electric and Manufacturing Company filed the bill praying a receivership on April 15, 1933, and the Company answered admitting the allegations of the bill and joining in the prayer for appointment of a receiver. Henry W. Kiel, former Mayor of the City of St. Louis, was appointed receiver of the Company and he was also subsequently appointed receiver of the Company's subsidiaries. Thomas E. Francis was appointed general counsel for the receiver.

While the St. Louis Public Service Company was in receivership, protective committees for the United Railways 4's and Suburban 5's issues were formed; the transportation business of the Company was carried on, tax and interest payments were made and payment on the stock purchase of the St. Louis Motor Coach Corporation was completed. Question was raised as to the validity of the pledge of the United Railways 4's made to the banks as security for the $10,000,000 loan; intervention in the litigation of this matter was attempted by one Slupsky, a holder of United Railways 4's, and an appeal was taken to this court. Attack was also made on the validity of the receivership proceedings and an ineffective appeal was taken from the order overruling the motion by which the attack was made. In March of 1934 the trustee of the United Railways 4's requested foreclosure and sale of the mortgaged property, and this action was subsequently consolidated with the receivership proceedings, Mr. Kiel continuing as receiver. Immediately after Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, became effective, 11:01 A.M. (St. Louis time), June 7, 1934, reorganization under the Act was sought by certain holders of United Railways 4's and the Committee organized for this class of security holder. Shortly thereafter the Company filed a voluntary petition for the same relief, and, Mr. Kiel having been appointed trustee, reorganization proceeded under the Act.

During the reorganization proceedings prosecuted under 77B, operations of the Company were continued, agreements were made with the Company's employees and the Union, and the tax claim of the United States was compromised. Other business transactions were consummated during the course of the reorganization, such as the substitution of purchased electricity for that formerly manufactured by the Company, and all matters of business were to some extent scrutinized by representatives of interests among the various classes of creditors having a stake in the reorganization. Mr. Watts, who was president of the Company at the time it went into receivership, was continued in office as far as might be by vote of the directors who were displaced by the receivership and 77B reorganization; Mr. Moloney, the former assistant general counsel of the Company, was also so continued at a salary voted him by the directors. Mr. Watts was an officer in the St. Louis bank which managed the $10,000,000 loan, and early in the course of proceedings he attempted to secure a reorganization, making a trip to New York to persuade interested New York banks to formulate a plan. Throughout the proceedings he counselled and advised those who came to him to get the benefit of his knowledge. Mr. Moloney gave his legal attention to matters the Company had to deal with. The trustees for

the United Railways 4's and the Suburban 5's intervened in the reorganization proceedings, and counsel for each interest took an active part. The various other interests were also represented and several different plans of reorganization were considered and found unacceptable. There was the inevitable struggle and contention as to the basis of the adjustment between the holders of the different bond issues and the banks holding bonds as collateral, and representatives of the interests not having such security endeavored to resist the major claims as a leverage to enhance their position.

A Committee for Reorganization, formed in 1937, and composed of bankers who represented among them the three dominant creditor classes, United Railways 4's, Suburban 5's and the $10,000,000 loan, finally reached agreement on a plan which was a small variation from that proposed by Mr. Snow of the Chase National Bank of New York and referred to as the "Snow" plan, and sometimes the "Clarke" plan after another officer of the Chase Bank who had been president of the transportation company and had given some attention to the reorganization problems. Contentions of the Gold Notes Committee and of the General Creditors' Committee had to be met and compromised. The City of St. Louis was interested as a holder of preferred stock and also as a municipality whose transportation system was at stake. The Public Service Commission of the State of Missouri had certain powers and authority and its consent was necessary to consummation. After the passage of the Chandler Act, 52 Stat. 840, c. 575, 11 U.S.C.A. § 1 et seq., the court held certain of its provisions were not of practicable application. That Act was not applied. A plan of reorganization was finally agreed upon under the procedure of 77B. The plan reduced book value of the assets of the Company by more than $26,000,000, and preserved liabilities as follows:

| | | |
|---|---|---|
| First Mortgage 5% Bonds | | $13,199,000.00 |
| Convertible 4% Income Bonds: | | |
| Issued | $15,858,351.55 | |
| Less: Pledged | 6,160,950.00 | 9,697,401.55 |
| Collateral Trust 4% Notes | | 4,200,655.00 |
| (Secured by $6,160,950.00 Convertible 4% Income Bonds and $33,252.00 Class B. Stock) | | |
| Current Liabilities | | 1,120,215.88 |
| Reserve for Depreciation | | 8,307,847.74 |
| Reserve for Injury and Damage Claims | | 353,278.57 |
| Surplus Reserve | | 15,954,221.84 |

| | |
|---|---|
| Capital Stock: | |
| Class A, $1.00 Par, issued and outstanding | 94,128.00 |
| Class B, $1.00 Par, 33,252 shares authorized, issued and pledged as partial security for Collateral Trust 4% Notes | .............. |
| | $52,926,748.58 |

The Company needed new street cars and buses, and the cash of the Company was to be expended for this sorely needed equipment—an estimated Five Million Dollars within three years.

Among the provisions of the plan of reorganization was the following, Part II, Section 7, relating to the expenses chargeable to the reorganized Company:

"7. Expenses and Costs of Reorganization.

"The Reorganized Company shall pay in cash all costs and expenses of administration and other allowances which may be approved or made by the Court in these proceedings, including allowance for services and expenses of protective committees, the reorganization committee, indenture trustees, the Company, officers of the Court for the management of the property of the debtor and the counsel of all such persons, corporations or groups, whether the services were rendered in connection with formulating the Plan of Reorganization, were rendered in connection with any of the controversies which arose in the reorganization proceedings or the prior equity receivership proceedings or were rendered in representing such persons, corporations or groups in the reorganization proceedings, or the prior equity receivership. The Reorganized Company shall pay in cash all costs, expenses and allowances which may have been incurred or may be made in the prior equity receivership."

The Court approved the Plan but reserved jurisdiction "to make any and all allowances as may be proper for the services" referred to in Section 7. The Court ordered that attorneys and others seeking allowances should present petitions setting out in general terms the nature of the services for which they claimed compensation, and forty separate petitions were filed some ten days before the hearing day, December 15, 1939.

At the hearing the Court expressed an intention that the proceeding be expedited and attempted to keep the examination of the witnesses within reasonable limits. Counsel for the reorganized company stated his posi-

tion, that compensation was not payable for services which did not accrue directly or indirectly to the benefit of the estate, and the Court indicated concurrence in that position. After the hearing the Court passed upon all the claims and the allowances relevant here are reflected by the following table.

courts of bankruptcy respecting the amount of allowances of compensation for services rendered are normally matters for the sound judicial discretion of the Court and should not be disturbed on appeal unless there is a clear abuse of discretion, nevertheless, an appellate court not only may, but must, interfere (a) where there has

| | Amount For Services | Asked For Expenses | Amount For Services | Allowed For Expenses |
|---|---|---|---|---|
| Samuel A. Mitchell (Counsel Reorganization Committee) | $50,000.00 | $ 121.51 | $25,000.00 | $121.51 |
| Rhodes E. Cave (Counsel Reorganization Committee) | 50,000.00 | 412.92 | 20,000.00 | 412.92 |
| W. F. Carter, Wm. T. Jones, Emmet T. Carter and Harold R. Small (Counsel for certain banks) | 75,000.00 | 1,866.83 | ......... | ...... |
| F. O. Watts (President of Company) | 32,708.33 | ....... | 3,000.00 | ...... |
| Robert E. Moloney (Counsel for Company) | 20,304.72 | 11.53 | 5,000.00 | 11.53 |
| Rhodes E. Cave (Counsel for St. Louis Union Trust Co., Trustee) | 25,000.00 | ....... | 5,000.00 | ...... |
| Rhodes E. Cave (Counsel Committee for United Ry. 4's) | 25,000.00 | ....... | 5,000.00 | ...... |
| Edward Greensfelder (Counsel Committee for Convertible Gold Notes) | 25,000.00 | 44.40 | 2,500.00 | 44.40 |
| Hyman G. Stein (Counsel General Creditors Committee) | 75,000.00 | 778.23 | 15,000.00 | 778.23 |

The above named claimants deem themselves inadequately compensated and have prosecuted separate appeals to this court, but present the following contentions common to their cases.

They contend: (1) That the Plan of Reorganization, approved by the Court, contains an express contractual obligation on the part of the Reorganized Company to pay compensation for all services rendered by the persons therein designated; (2) that such contractual obligation having been approved by the Court was binding upon the Reorganized Company and placed the duty upon the Court itself to enforce the performance of the obligation; (3) since the rights to compensation are fixed and provided for in the Plan of Reorganization, decisions arising under either Section 77B or the Chandler Act are not applicable; (4) that the rights of the several appellants to compensation for the services severally rendered by them, if and to the extent that they are not governed by the provisions of the Plan of Reorganization, are governed by applicable provisions of Chapter X of the Chandler Act, 11 U.S. C.A. § 501 et seq.; (5) that if and to the extent that the rights of the appellants to compensation are governed by applicable provisions of Chapter X of the Chandler Act, decisions arising under Section 77B are not applicable; (6) that although the law is well settled that the judgments of

been an abuse of discretion; (b) where the trial court has failed to exercise its discretion; (c) where there is no adequate factual basis to support the judgment of the trial court; (d) where the trial court has proceeded upon an erroneous theory of the law in arriving at its judgment; (7) that such discretion relates only to the amount to be allowed and not to the legal right to an allowance or the kinds of services for which an allowance shall be made; (8) that in the present case the District Court had no real advantage over this Court in making the allowances which are the subject of these several appeals; (9) that the financial condition of the Reorganized Company is such that it is well able to pay reasonable compensation for services rendered by appellants, and each of them.

█ Section 7 of Plan. Section 7 of the approved Plan of Reorganization, above set forth, broadens the field of services compensable by the reorganized Company on the determination and order of the Court to the extent that both the receivership and the reorganization proceedings are included and that compensation is not to be denied because services to the estate might also be services to a client. To that extent the section was appropriate and was properly incorporated in the plan. The section recites that the "Reorganized Company shall pay in cash all costs and expenses of administration and other allowances which

may be approved by the Court in these proceedings", but the wording of the section does not justify an interpretation that the court must allow fees to attorneys or others which are not properly included under the law as costs and expenses of administration. Appellants would have the section construed as though it read that the reorganized company should be required to pay as costs and expenses of administration all fees chargeable for services to their clients. But we think costs and expenses of administration which the section declares the reorganized company shall pay are those which are allowable under the law and none other. Such costs and expenses of administration do not include fees for services rendered primarily in the interests of private clients. They include only the services rendered in advancement of the reorganization proceedings and for the benefit of the estate. Stark v. Woods Bros. Corp., 8 Cir., 109 F.2d 969, 972; Silver v. Scullin Steel Co., 8 Cir., 98 F.2d 503, 505; Teasdale v. Sefton National Fibre Can Co., 8 Cir., 85 F.2d 379, 381, 107 A.L.R. 531; In re Herz, Inc., 7 Cir., 81 F.2d 511, 513; Straus v. Baker Co., 5 Cir., 87 F.2d 401, 407; In re New York Investors, Inc., 2 Cir., 79 F.2d 182. If there may be said to be any ambiguity in section 7, it should be construed in accord with the applicable law, see Marx v. United States, 8 Cir., 86 F.2d 245, 248; Compagnie Generale Transatlantique v. American Tobacco Co., 2 Cir., 31 F.2d 663, 666, and the ambiguities resolved against those who drafted it. See Northern Pac. Ry. Co. v. Twohy Bros., 9 Cir., 95 F.2d 220, 223; E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 228, 89 A.L.R. 238; Queen Insurance Co. v. Milling Co., 8 Cir., 43 F.2d 885, 887, 888; Sternberg v. Drainage District, 8 Cir., 44 F.2d 560, 562. The trial court's action reflects that he approved the reorganization plan under the construction that he would retain jurisdiction for lawful and proper allowances only, and that he recognized therein no shifting of liability for fees or compensation from clients to the reorganized company. He restricted compensation to services which benefited the estate and such action was not erroneous. Stark v. Woods Bros. Corp., 8 Cir., 109 F.2d 969; Schnader v. Reading Hotel Corp., 3 Cir., 105 F.2d

572; In re Buildings Development Co., 7 Cir., 98 F.2d 841, 844; Milbank, Tweed & Hope v. McCue, 4 Cir., 111 F.2d 100; Wright v. City National Bank & T. Co., 6 Cir., 104 F.2d 285; Reconstruction Finance Corp. v. Herring, 9 Cir., 110 F.2d 320; In re Prudence Co., Inc., 2 Cir., 98 F.2d 729, 731, 732; Zweifel, Tuohy & Crager v. Trans-State Oil Co., 5 Cir., 99 F.2d 650.

Whether rights to compensation under 77B or the Chandler Act may be augmented by special agreement in the reorganization plan is not decided.[1] The appellants do not have such a contract incorporated in the plan in this case.

Appellants complain that the trial court did not take a longer time to study their several petitions for fees, but the court was familiar with the whole course of the receivership and reorganization, and within the time taken he could, and we find no reason to doubt that he did, adequately consider each of the petitions.

The fact is stressed for appellants that the reorganized company has cash available "and is well able to pay reasonable compensation." But its pressing needs are also very apparent and unless great outlay is made the people of St. Louis will not be adequately served with transportation. All the attorneys who served in these proceedings must be regarded as acting in a quasi-public capacity and the situation required that the costs and expenses be kept strictly within reasonable bounds.

With these general considerations in mind, we turn to the several appeals separately.

No. 11663—*Rhodes E. Cave v. St. Louis Public Service Company, Debtor, et al.*

Rhodes E. Cave served in the reorganization proceedings as counsel for the St. Louis Union Trust Company, Trustee for the United Railways 4's, as counsel for the Bondholders' Protective Committee for the United Railways 4's, and also as co-counsel for the Reorganization Committee. He also served in the receivership proceedings and had served in the earlier 1927 reorganization, at which time he became familiar with the problems and affairs of the company. He was appointed in these proceedings as co-counsel for the Reor-

---

[1] See Silver v. Scullin Steel Co., 8 Cir., 98 F.2d 503; Williams v. Great Lakes Term. W. Co., 6 Cir., 87 F.2d 115, 117, 118; Wright v. City National Bank & T. Co., 6 Cir., 104 F.2d 285.

ganization Committee several months after Samuel A. Mitchell had been appointed. In the three capacities, which caused overlapping work, Mr. Cave gave expert and efficient attention to most of the important matters throughout the proceedings, and also utilized the services of his law partners and the firm's assistants. He kept no time record on the work as he deemed the time factor irrelevant and misleading as a criterion for the valuation of legal services such as were required in his employment in these proceedings. The list of his services is impressive, and in addition to the arguments in the briefs he invokes comparisons between the fees allotted to him in this action and those allotted to others; also comparisons between the fees here allowed to him and those allowed to attorneys in other large reorganizations. Some of Mr. Cave's services were rendered for private clients and were properly to be compensated by them rather than by the reorganized company. Careful consideration of the comparisons between Mr. Cave's allowances and those made to other attorneys in other reorganizations [2] may force concession that the scale on which Mr. Cave's allowances have been made was not a high one. The trial court has not offended against the oft-repeated declaration of the appellate courts that fees are to be granted with a view to reasonable economy of administration. Doubtless the public and quasi-public nature of reorganizing the St. Louis transportation system weighed with the court. Although we are impressed with the able brief and presentation, and concede that such services as Mr. Cave performed have often resulted in greater compensation than was awarded him—even that a higher allowance might have been made to him within the court's discretion—we do not find that the court abused his discretion in making this allowance.

Affirmed.

### No. 11664—*Samuel A. Mitchell v. St. Louis Public Service Company, Debtor, et al.*

▆ Samuel A. Mitchell served for some two and a half years as counsel for the reorganization committee. With Mr. Cave, who was appointed co-counsel for the committee some four and a half months after Mr. Mitchell's appointment, he performed expert and efficient services beneficial to the reorganization. The co-counsel avoided duplication of services as much as they could in the exercise of their good judgment. Mr. Mitchell received the largest individual fee of those granted to attorneys other than the attorney for the trustee, and his fee added to that granted Mr. Cave is some $10,000 less than the total amount of the fees granted to the members of the committee for which they served as counsel. Mr. Mitchell submits in an able argument that the fee allotted to him, $25,000 (one-half of the amount which he requested), is so inadequate that its allowance demonstrates an abuse of discretion on the part of the trial court. Mr. Mitchell calls attention to the fact that the plan which he had part in formulating was so satisfactory that it avoided extended and expensive litigation. He refers to the extent and value of his various services and contends that the trial court must have erred in failing to consider the factor of overhead expense to which attorneys are subject.

Although Mr. Mitchell rendered extended and valuable services, it does not appear that he devoted his time exclusively to the matter of the reorganization, and hence he had opportunity to earn other income which would also offset his overhead expenses. Although he points out that committees are usually compensated at a lower rate than their attorneys for services rendered in reorganization proceedings, it is peculiarly difficult for an appellate court to distinguish between the beneficial work done by a committee and that done by the attorney in matters of negotiation and formulation of plans. While this plan was commendably worked out in a way which avoided objections, the trial court may have determined that this virtue of the plan derived from committee members rather than their attorneys. We find no abuse of discretion.

Affirmed.

---

[2] In re United Railways & Elec. Co., D.C., 11 F.Supp. 717; Id., D.C., 15 F. Supp. 195; In re Central West Public Service Co., D.C., 15 F.Supp. 770; In re United Cigar Stores of America, D. C., 21 F.Supp. 869; Watters v. Hamilton Gas Co., D.C., 29 F.Supp. 436; In re Paramount-Publix Corp., D.C., 12 F. Supp. 823; In re National Department Stores, D.C., 11 F.Supp. 633; In re Vicksburg Bridge & Terminal Co., D. C., 29 F.Supp. 225.

### No. 11668—*W. Frank Carter, et al. v. St. Louis Public Service Company, Debtor, et al.*

W. Frank Carter and associated members of his law firm represented banks which participated in the $10,000,000 loan. The members of the firm did considerable legal work for the banks, particularly in the matter of sustaining the validity of the bond pledge made by the debtor. In the petition for allowance of a fee the attorneys set out the work which they did for their clients, the banks, but made no sufficient showing of having performed service for the estate or service which was of a distinct and separate benefit to the estate. The notes held by the banks contained provisions for the payment of attorneys' fees where suit was necessary to enforce collection. Mr. Small testified on Mr. Carter's behalf that the attorneys' fee provision of the notes was properly a part of the banks' claim. He was asked:

"Q. Well, is that the gravamen of your claim, that you are entitled to allowance for your services because the notes so provide? A. No sir; it is not; it is that the services rendered in getting to a conclusion and finding by the Special Master that the bonds and the loan and the collateral were all valid, and under this paragraph 7 of this order, if it is applicable, and we thought it was and understood it was, that under those circumstances the plan was that there was to be this payment. Now, if we are wrong in that we have no claim.

"Q. You really looked to your banks for your payment, did you not? A. We looked to the banks, yes, sir; until this provision in the plan."

The firm had been paid $25,000 on account and the witness said that it intended to submit a bill to the banks for the balance of $50,000 if it was not paid through an order of allowance.

We need not hold that the efforts of Mr. Carter and his associates occasioned no benefit at all to the estate. But it is manifest that all of such effort was primarily for their own clients and what benefit there may have been to the estate was remote and secondary. The refusal of the trial court to allow any fee against the estate on account of this claim presents no abuse of discretion or reversible error. In re Herz, Inc., 7 Cir., 81 F.2d 511; Teasdale v. Sefton National Fiber Can Co., 8 Cir., 85 F.2d 379, 107 A.L.R. 531.

Affirmed.

### No. 11670—*Frank O. Watts v. St. Louis Public Service Company, Debtor, et al.*

Frank O. Watts filed a brief petition for an allowance of compensation, stating that he was elected president of the Debtor in the course of the receivership proceedings and that he was from time to time re-elected throughout the period of reorganization, all at a salary of $5,000 a year. He stated that he rendered personal services in the administration of the estate and in the formulation and consummation of the reorganization plan, "all of which were beneficial to the estate of Debtor and are of the reasonable value of Thirty Two Thousand Seven Hundred and Eight and 33/100 Dollars", the amount of the salary, "no part of which has been paid". He requested payment in this amount.

At the fee hearing he testified that early in the course of the proceedings it was he who was first interested in the reorganization and devoted considerable effort to get the parties interested to form a plan. That he not only pursued this effort with trips to New York City, but also throughout the proceedings gave advice to the various committees and consulted with the management on its problems as well as with individuals "for information or for any solace I could give them as an investor". That he kept in constant contact with the reorganization. He could not, however, give an idea of what portion of his time he devoted to these duties except that he devoted "a great deal of time that otherwise would have been my time for recreation. I didn't neglect the duty of the Bank." He was chairman of the Board of the First National Bank of St. Louis and a director of the St. Louis Union Trust Company. He received his customary compensation from his bank, which was one of the banks represented in the proceeding, by having one of its officers on the Reorganization Committee.

In the claim filed by Mr. Watts there was no specification of any services performed by him compensable in the proceedings, and his testimony given on the hearing of his claim failed to identify any such service with sufficient certainty to sustain an allowance to him on account thereof. Although it was proper that the office of president of the corporation should have an incumbent during its receivership and proceedings under Section 77B of the Bankruptcy Act in order to continue the corporate shell,

it was not shown that there was any substantial interest of the corporation requiring representation not provided for by court appointments. The trial court was not bound to award the salary fixed by the Board of Directors, and neither the claim filed nor the testimony offered in support of it disclose any abuse of discretion in the allowance made.

Affirmed.

#### No. 11662—*Robert E. Moloney v. St. Louis Public Service Company, Debtor, et al.*

 Notwithstanding its receivership and reorganization in bankruptcy, the corporation, St. Louis Public Service Company, maintained the integrity of the corporate shell through the elected Board of Directors. The board included representatives of banks and other secured creditors of the corporation who were interested in the estate of the debtor and in all matters affecting their security. They elected Robert E. Moloney assistant general counsel for the corporation in June of 1934 and assumed to fix a salary of $1,800 a year, and in March of 1936 they elected him general counsel, assuming to fix the salary at $5,000 a year. Mr. Moloney took no steps to obtain any authorization from the court to act as attorney for the corporation and it is not claimed that he devoted full time to such service. The items of service which he lists in his claim cover some fifty typewritten pages and include court appearances, examination of papers, documents and pleadings and a great number of conferences and much correspondence. Counsel for the trustee did not employ Mr. Moloney to assist him and assumed that Mr. Moloney was serving the banking interests which had strong representation on the Board of Directors. There is no doubt that Mr. Moloney performed a great amount of service throughout the reorganization proceedings, nor that it was of substantial value. The amount awarded him by the decree was $5,000, which, as he points out, amounted to a salary of only $75 per month. He insists it was grossly inadequate. He points out that the Chandler Act, 11 U.S.C.A. § 641, authorizes allowance of compensation for the attorney for the debtor and contends that he should receive at least the amount designated as his salary by the Board of Directors.

But we find no error in the award made to Mr. Moloney by the trial court. The court duly appointed both general and assistant counsel for the trustee who had stepped into the shoes of the corporation. There is nothing in the record to rebut the natural inference that the services listed by Mr. Moloney in his claim constituted a duplication of the work of the attorneys for the trustee, see Stark v. Woods Bros. Corp., 8 Cir., 109 F.2d 969, 972; In re Standard Gas & Elec. Co., 3 Cir., 106 F.2d 215; In re Prudence Co., Inc., 2 Cir., 98 F.2d 729, or else that they were rendered primarily for parties who were otherwise represented; or that he rendered many services as a mere volunteer.[3] In re Allied Owners Corp., 2 Cir., 79 F.2d 187, 191; In re Prudence Co., Inc., 2 Cir., 98 F.2d 729, 731, 732; see Straus v. Baker Co., 5 Cir., 89 F.2d 322; Zweifel, Tuohy & Crager v. Trans-State Oil Co., 5 Cir., 99 F.2d 650. The sum of $5,000 allowed him appears to have been adequate compensation for all services shown to have been rendered for the debtor which were properly compensable in the proceedings.

Affirmed.

#### No. 11661—*Edward Greensfelder v. St. Louis Public Service Company, Debtor, et al.*

 Edward Greensfelder represented the Convertible Gold Note holders, having been retained by the committee formed to protect their interests. In his petition for fee allowance he set out that this committee was the only representative of the noteholders who had no representation on the reorganization committee. The claims based on the notes aggregated about $2,228,875, and claimants holding about half of the aggregate were joined in forming the committee. Mr. Greensfelder prosecuted the claim vigorously and secured $30.00 in cash for each $1,000 over and above the amount the reorganization committee had been willing to give. Ninety-one percent of the noteholders accepted the plan, which was finally submitted and confirmed. Mr. Greensfelder appeared before a special master and established that the noteholders were entitled to interest on their obligations, not only from January 1, 1933, but for the period of the receivership, and his victory in this matter accounted in large part for the additional cash given his

---

[3] Moloney rendered many of his services before the Chandler Act was passed; after enactment of its provisions, the Court held them impracticable of application to the pending reorganization.

clients. He was instrumental in upsetting a proposed plan of reorganization in which the noteholders would have received less than they finally obtained. He participated in consultations with other interests on behalf of the noteholders and advised the noteholders' committee, taking an active part in having a successor trustee appointed under the Gold Note indenture. He also fought the bond interests in the matter of the lien claimed by them on the Peoples Motor Bus Company assets, though he entered this controversy late, and in the $10,000,000 bank loan pledge controversy we find no particular results specifically attributed to his efforts. His contract with the noteholders contained the following: "It is further agreed that provisions shall be made in the Plan for the payment in cash of the reasonable compensation and expenses of the Noteholders' Committee and its counsel for their services in, and in connection with, the reorganization proceedings, the amount of such compensation and expenses of the Noteholders' Committee and its counsel to be determined by the Court in said reorganization proceedings." At the fee allowance hearing he took the position that all of the services which he rendered the noteholders and their committee were to the interests of the estate. He contended that "the different classes of security holders and the debtor itself are one and a part of the same thing and cannot be separated". The attorney for the trustee of the debtor would not concede that Mr. Greensfelder had done anything to the benefit of the estate and took the position that Mr. Greensfelder's action in blocking a promising plan of reorganization and in demanding and obtaining larger payments for his clients was a positive detriment.

The compensation properly allocable to a committee and its attorney is primarily a matter for the discretion of the trial court, but of the two the committee, generally speaking, advances the reorganization by unifying numerous claimants under a single representative, while the attorney works more in the interest of the clients and for the enhancement of their share in available assets. An attorney may often contribute more towards the benefit done the estate, but there can be no general rule that in each case he has done so, see and Cf. In re Detroit International Bridge Co., 6 Cir., 111 F.2d 235, 238, and it appears that the court, upon the facts in the present case, considered that Mr. Greensfelder rendered services more for the benefit of the clients than for the benefit of the reorganized company. In the proceedings for the allowance of fees the court was not concerned with the question of the amount of fees which Mr. Greensfelder's clients or the noteholders committee might be obligated to pay him. It was apparent that any benefits accruing to the estate from Mr. Greensfelder's efforts on behalf of his clients were comparatively remote and incidental. Discretion was not abused in the allowance made to him.

Affirmed.

### No. 11669—*Hyman G. Stein v. St. Louis Public Service Company, Debtor, et al.*

Hyman G. Stein represented the tort claimants in the reorganization proceedings and also appeared for the general creditors and for the City of St. Louis. His principal services were rendered on behalf of the tort creditors who through his efforts received a substantially larger share of the estate than original plans of reorganization allotted to them.

If the trial court was justified in restricting Mr. Stein's allowance by relating it to the benefit of his services to the estate, the order should be sustained, but Mr. Stein contends that the special provision of the Reorganization Plan, Section II (2d), entitled him to have the full amount of a reasonable contingent fee allowed him. The provision is appended [4] and we

---

4 "Holders of Tort claims will receive a sum in cash equal to 35% of the principal amount of their respective claims (without interest) and, in addition thereto, and as a further payment on account of such claims the Reorganized Company shall pay in cash the reasonable compensation and expenses of The General Creditors' Committee formed under agreement dated as of July 16, 1934, and its counsel, for their services in, and in connection with, the reorganization proceedings, the amount of such compensation and expenses to be determined by the Court; said sums in cash to be paid as promptly as reasonably possible after the confirmation of the Plan of Reorganization, and exclusive of court costs which will be paid in full by the Reorganized Company; said sums to be so paid on account of said tort claims shall be in full settlement of the respective claims of tort claimants against the Company and its property."

think the wording, like that of Section 7 heretofore discussed, is compatible with an intent to cover compensable services only and to leave the amount thereof to the sound discretion of the trial court. Mr. Stein's efforts were primarily for his clients and the amount allowed him was not disproportionate to the benefit to the estate.

Affirmed.