**COOKE v. BOWERSOCK, et al.**

**In re FLOUR MILLS OF AMERICA, Inc.**

**No. 11969.**

Circuit Court of Appeals, Eighth Circuit.

Oct. 16, 1941.

Rehearing Denied Nov. 3, 1941.

Edgar Shook, of Kansas City, Mo. (David R. Hardy and Sebree, Shook & Gisler, all

68, 66 L.Ed. 186; Cullinan v. Walker, 262 U.S. 134, 43 S.Ct. 495, 67 L.Ed. 906;

Marr v. United States, 268 U.S. 536, 45 S.Ct. 575, 69 L.Ed. 1079.

of Kansas City, Mo., on the brief), for appellant.

Justin D. Bowersock, of Kansas City, Mo. (Robert B. Fizzell and John F. Rhodes, both of Kansas City, Mo., on the brief), for appellees Bowersock, Fizzell & Rhodes.

J. Kirk Windle, of Chicago, Ill., Atty., Securities and Exchange Commission (Chester T. Lane, Gen. Counsel, of Washington, D. C., W. McNeil Kennedy, of Chicago, Ill., and Homer Kripke, of Washington, D. C., Attys., Securities and Exchange Commission, on the brief), for Securities and Exchange Commission.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

This is an appeal by Thornton Cooke, Independent Trustee in corporate reorganization proceedings under Chapter X of the Revised Bankruptcy Act of 1938, 11 U.S.C.A. § 501 et seq., from an order allowing compensation and reimbursement for expenses out of the Debtor's estate to the law firm of Bowersock, Fizzell and Rhodes as attorneys for a gold noteholders' committee known as the Vincent Committee which participated in the reorganization proceedings. The appellant seeks to have the compensation and reimbursement of expenses disallowed on the grounds (1) that as a matter of law the attorneys (who are the appellees) are entitled to no compensation out of the Debtor's estate, and (2) that the allowance is so excessive as to have no reasonable relation to the facts and constitutes a clear abuse of judicial discretion. The appeal is heard upon the original papers in compliance with Section 250 of the Revised Bankruptcy Act of 1938, 11 U.S.C.A. § 650, each of those designated by the parties having been given a document number for reference here. Some 120 such documents are thus brought to our attention and these, together with elaborate statements of the facts in the briefs and oral arguments of counsel, afford sufficient basis for understanding of the contentions and decision of the controversy.

Flour Mills of America, Inc., a Maryland corporation, hereinafter referred to as "Debtor", filed its petition March 20, 1939, in the United States District Court for the Western Division of the Western District of Missouri, for reorganization under Chapter X of the Revised Bankruptcy Act of 1938. It owned and controlled all of the outstanding capital stock of The Kansas Flour Mills Corporation, a Delaware corporation, and Valier and Spies Milling Corporation, a Delaware corporation. The principal business of the Debtor's wholly-owned subsidiaries was the buying, selling, storing, milling and distributing of grain, wheat, wheat flour and wheat mill feeds.

The books of the Debtor on February 28, 1939, just prior to the filing of the petition for reorganization, showed assets of $6,015,681.80. At that time the Debtor had outstanding $2,800,000 in principal amount of twenty year six and a half per cent (6½%) Convertible Gold Notes, Series A, due April 1, 1946, with accrued and unpaid interest due on said notes in the amount of $75,833.33. There were authorized 80,000 shares of eight per cent (8%) cumulative preferred stock of no par value, of which 25,000 shares were issued and outstanding, and 525,000 shares of $1 par value common stock, of which 500,000 shares were issued and outstanding.

On March 21, 1939, the District Court entered an order approving the Debtor's petition. On the same day the court entered an order appointing appellant as Independent Trustee, Ralph W. Hoffman as Additional Trustee, Edgar Shook counsel for the Trustee, and Cyrus Crane and R. Arch Smith and the law firm of Lathrop, Crane, Reynolds, Sawyer & Mersereau counsel for the Debtor. The Trustee was directed by said order to make a report of the financial condition of the Debtor and of the Trustee's opinion as to the desirability of continuing the Debtor's business. The said Trustee was further ordered to file a plan of reorganization or a report of his reasons why a plan could not be effected.

A Preferred Stockholders' Protective Committee, three gold noteholders' committees (afterwards reduced in number by a merger) and the Securities and Exchange Commission appeared and participated in the proceedings (the latter at the request of the court) before the Vincent Committee entered its appearance. It filed a petition to intervene on May 1, 1939, through its attorneys, William Ritchie and the appellees, but on May 5, 1939, the District Court decided that the Revised Bankruptcy Act does not contemplate the limiting of recognition to a few committees but gives to every interested person the right to be heard, and sustained a motion of the Securities and Exchange Commission to vacate orders allowing the intervention of the committees. In re Flour Mills of America, Inc., D.C., 27 F.Supp. 559. The

committees and the Commission continued to participate, however, and their respective counsel were recognized and heard.

Pursuant to the order of March 21, 1939, a report and a supplemental report were filed by the Trustees and by the Independent Trustee, reporting that on the basis of the financial estimates of Arthur Young and Company and the appraisals of Horner and Wyatt, engineers, the current assets amounted to $2,135,326.55, and fixed assets $2,963,829, total $5,099,155.55, and that the Debtor should continue to do business and the business was carried on through the Additional Trustee Ralph W. Hoffman, former president of the company. On June 20, 1939, a hearing was had before the court upon the question of the propriety and desirability of retaining Mr. Hoffman, president of the Debtor and Additional Trustee, as operating head of the Debtor. The Trustee proposed and favored Mr. Hoffman's retention and the appellees strenuously opposed it. The court ordered his retention.

Following the order of his appointment, the Independent Trustee began an exhaustive study of the Debtor and of its financial condition. After much study, consideration and investigation, the Trustee arrived at a valuation of the assets of $3,-202,000. The Trustee concluded that while there was no equity in common stockholders of the Debtor, there was an equity in the preferred stockholders and such equity should be recognized and provided for in any plan of reorganization. Having so concluded, the Trustee on November 29, 1939, filed his proposed plan of reorganization which recognized the equity of the preferred stockholders and provided for the issuance of term notes to the noteholders and common stock to the preferred stockholders. Said plan applied the theory of relative rather than strict priority and did not make provision for the accrued and unpaid interest on the gold notes. In the preparation and promulgation of his plan the Trustee was assisted by suggestions and proposed amendments offered by counsel for the Debtor, the preferred stockholders' committee, and the noteholders' committees other than the Vincent Committee. Whether the Vincent Committee or its counsel so assisted is vigorously disputed and has received our consideration.

On December 8, 1939, the Archer Noteholders' Committee, by its attorneys George Reinhardt and Edward L. Scheufler, filed its petition to amend the Trustee's proposed plan of reorganization. Said committee proposed several amendments, one of which was an amendment which provided for the recognition of accrued and unpaid interest on the gold notes of the Debtor by the issuance of certificates of indebtedness (apparently non-interest bearing) by the Debtor to the holders of such gold notes. Its proposal was that such interest at the rate of five percent instead of the six and one-half percent promised on the face of the notes, be recognized.

On December 11, 1939, appellees filed objections of the Vincent Committee to the Trustee's plan of reorganization on the grounds, i. a., that it was "neither fair, equitable nor feasible and should in all things be by this court disapproved". It also filed a plan of reorganization which recognized no interest in the common or preferred stockholders and provided for no funded debt, but contemplated vesting the assets in the gold noteholders by issuing stock to them in proportion to their note holdings.

The preferred stockholders' committee, the Merged Noteholders' Committee and the Debtor filed proposed amendments to the Trustee's plan.

On December 15, 1939, a hearing was begun in the District Court pursuant to a petition which the appellees had filed for the Vincent Committee to evaluate the assets of the Debtor and to consider the plans of reorganization and objections and amendments to the Trustee's plan. During the course of said hearing numerous experts testified in support of the valuations found by the Trustee and stated in the Trustee's plan, while the evidence of appellees was limited to the testimony of Fred C. Vincent and Charles E. Valier, two members of the Vincent Committee, and to evidence elicited by cross examination in which Mr. Rhodes of appellee's firm took the lead. Following said hearing the District Court submitted the Trustee's proposed plan, objections and amendments thereto, and the plan of the Vincent Committee, to the Securities and Exchange Commission with the request that the Commission render an advisory opinion as to the fairness and feasibility of the plans and the various objections and amendments to the Trustee's plan.

On April 1, 1940, the Securities and Exchange Commission rendered its advisory opinion. The Commission found the Debt-

or to be insolvent, disapproved of the Trustee's plan, and approved the plan of the Vincent Committee advocated by appellees.

On May 6, 1940, M. L. Webber, a secretary in appellee's law office and also secretary of the Vincent Committee, sent a letter to all noteholders in which the position taken by appellees and said committees was stated. The letter indicated that the appellees and the Vincent Committee vigorously opposed the Trustee's plan, and that all other committees supported the Trustee's plan and proposed amendments thereto. See 11 U.S.C.A. § 207, sub. c(4).

On May 15, 1940, appellees on behalf of the Vincent Committee filed in the District Court a brief entitled "Brief of Vincent Committee in Opposition to Trustee's Plan of Reorganization and all Amendments Thereto, and in Support of the Vincent Committee Plan of Reorganization and the Advisory Opinion of the Securities and Exchange Commission". The Debtor, the preferred stockholders' committee, and both of the other noteholders' committees filed briefs in support of amendments proposed by them to the Trustee's plan. The brief of appellees on the other hand neither proposed nor supported any amendments to Trustee's plan. Appellees' brief merely opposed said plan in toto and confined its argument to affirmative support of the Vincent Plan and the opinion of the Securities and Exchange Commission. On May 20, 1940, appellees filed a reply brief in opposition to the Trustee's plan.

The District Court heard oral argument of counsel for the various parties in interest on May 23, 1940, concerning the valuation of assets of the Debtor and concerning the proposed plans of reorganization and objections and amendments to the Trustee's plan. All parties except appellees argued in support of a finding that the Debtor was solvent. Mr. Rhodes of appellees' firm made the argument for the Vincent Committee and reaffirmed his position that the Debtor was insolvent and should be turned over to the use of the noteholders so they could liquidate it or not as they might see fit.

On June 18, 1940, the District Court filed its "Memorandum Opinion on Proposed Plans of Reorganization" in which it found the value of the Debtor's assets to be approximately $3,200,000, as stated by the Trustee in his proposed plan. The court observed in respect to its finding on the value that "there was no substantial countervailing proof. The evidence overwhelmingly preponderated in favor of the values above stated". The District Court disapproved the plan of the Vincent Committee and approved the Trustee's plan subject to an amendment which would make provision for all the accrued interest due and unpaid on the outstanding gold notes which by that time approximated $325,000.

In accordance with the District Court's opinion the Trustee submitted two methods of compensating the gold bondholders for the accrued interest on the gold notes, to-wit: (1) issuing common stock to the noteholders, or (2) issuing non-interest bearing certificates of indebtedness.

On June 25, 1940, there was a hearing in the District Court at which the Trustee presented the alternative amendments for discussion. The Trustee stated that he favored the amendment providing for the issuance of certificates of indebtedness. Appellee Mr. Rhodes stated that he preferred that common stock be issued rather than certificates of indebtedness, and asked the court for permission to file certain proposed amendments. Appellees' amendment No. 2, which provides for the issuance of common stock as compensation to the noteholders for accrued and unpaid interest, was filed July 5, 1940.

On June 26, 1940, the Trustee filed certain amendments to his said plan, one of which provided for the issuance of certificates of indebtedness to the noteholders to compensate them for accrued and unpaid interest. The court submitted the proposed amendments of the Trustee, those prepared by appellees for the Vincent Committee, and those proposed by the Merged Committee, to the Securities and Exchange Commission for its supplemental advisory opinion.

On July 12, 1940, the Commission filed its supplemental report on proposed amendments to the plan of reorganization in which it approved the amendment proposed by the Trustee and by the Merged or Jones Committee, and disapproved the amendment filed by appellees on behalf of the Vincent Committee. The Commission found that, on the basis of the values found by the District Court, the participation granted to the noteholders by appellees' proposed amendment would provide for excessive participation by the noteholders and would be unfair to the preferred stockholders.

By letter dated July 13, 1940, and addressed to A. L. Arnold, District Clerk, the District Court approved the amendments proposed by the Trustee and disapproved the amendments proposed by the Vincent and Jones (Merged) Committees. On July 29, 1940, the District Court entered an order to the same effect.

The Trustee's plan as amended was submitted to the creditors and preferred stockholders of the Debtor, accepted by the requisite percentage thereof, and confirmed by order of the District Court on December 16, 1940.

All parties participating in the reorganization proceedings filed their applications for compensation and reimbursement for expenses, that of appellees being filed on December 2, 1940. Objections were filed by the preferred stockholders' committee to any allowance of compensation to the Vincent Committee and appellees. On December 14, 1940, the Trustee filed his objections to the applications for compensation and reimbursement of expenses. Following a hearing on said applications, at which the Securities and Exchange Commission made recommendations as to the amount of compensation and expenses which should be allowed out of the Debtor's estate to the various parties, the District Court on January 25, 1941, filed its memorandum opinion on allowances.

On February 8, 1941, there was a further hearing on the applications for fees and expenses, and on March 4, the District Court entered an order making allowances of compensation and reimbursement of expenses. The allowances made to the various committees and their attorneys amounted in the aggregate to $28,870.08. Those made to appellees were: for compensation, $8,500, for expenses $522.91, total $9,022.91.

The reorganization proceedings in which the appellees participated as attorneys extended over the period from March, 1939, to December, 1940, being about twenty months, and appellees claim that Mr. Rhodes devoted upwards of one hundred and eleven days to the case in office work and fourteen days in court, and that there was in addition some substantial time spent on the case by his associates in the office not members of the firm.

Following the entry of the order allowing compensation and expenses, appellant Trustee filed in this court his petition for leave to appeal from the order of allowance to Mr. Rhodes' firm, his assignments of er-

ror, and his contentions in support of his said petition. On March 24, 1941, this court entered an order granting the Trustee leave to appeal, and that is the appeal now before the court.

The right of the appellees to an allowance is determined by 11 U.S.C.A. §§ 642 and 643, as amended by the Chandler Act and as interpreted by the decisions, and the parties agree that the decisions recognize a discretion vested in the District Court and that the appellate courts must give due regard to the opportunity of the District Judge not only to hear, observe and judge of the credibility of the witnesses, but also to familiarize himself with the proceedings and the services of counsel for which compensation is asked. There is, however, no question of the power and duty of this court to review an order making allowances out of the Debtor's estate, or of its power and duty to vacate or modify any such order which it finds to be contrary to law or unsupported by the evidence. Greensfelder v. St. Louis Public Service Co., 8 Cir., 114 F.2d 53; Reconstruction Finance Corp. v. Herring, 9 Cir., 110 F.2d 320; In re Porto Rican Tobacco Co., 2 Cir., 117 F.2d 599; Stark v. Woods Bros. Corp., 8 Cir., 109 F.2d 969; Schnader v. Reading Hotel Corp., 3 Cir., 105 F.2d 572; Teasdale v. Sefton Nat. Fibre Can Co., 8 Cir., 85 F.2d 379, 107 A.L.R. 531; Silver v. Scullin Steel Co., 8 Cir., 98 F.2d 503; West v. Fradenburg, Webb, Beber, Klutznick & Kelley, 8 Cir., 86 F.2d 318.

The contention of the appellant is that the appellees did not render any services compensable out of the Debtor's estate within the meaning of the statute in that their services "did not contribute to the plan confirmed" and were not services "which were beneficial to the administration of the estate * * * and to the proper costs and expenses incidental thereto." He contends that in respect to the plan of reorganization which was confirmed the services which appellees rendered for their clients were directed to obstructing and hindering and making its consummation more difficult. He also contends that there were no services beneficial to the administration of the estate or the costs and expenses.

As the statute, 11 U.S.C.A. § 642, limits the power of the court in making allowances to the consideration of only those services which are specified, the burden was upon the applicants for the allowance to

show that their services were of the kind made compensable by the statute. The bare outline of the proceedings which we have set out is merely to indicate the general course of the reorganization proceedings. We have not undertaken to cover the details of the 125 days devoted to the case by Mr. Rhodes nor have we failed to consider his contention that such outlining obscures and distorts the true picture of services in respect to their extent and their compensability.

■ But it is clear from the general outline—and none of the details permit a contrary inference—that the main conflict of interest which had to be reconciled to effect a reorganization of the company was between the preferred stockholders of the company and the holders (more than a thousand in number) of its six and one-half percent gold notes, and that the conflict was ultimately reconciled by the plan which provided for the formation of a new corporation which was to issue common stock to the old stockholders and notes to the old noteholders. The management and control was not accorded to those who had owned the gold notes but to those who had held the preferred stock interest. Our inquiry must be directed to appellees' claimed contribution to such a plan of reorganization.

We have been unable to find from the record (indeed, it is not claimed) that the Vincent Committee or Mr. Rhodes for them, ever presented any pleading or oral or written argument advocating anything that was not in irreconcilable conflict with the effected plan. We cannot find any record of any action or contention on their part indicating anything other than objection and opposition to any such concession on the part of their clients as the plan necessarily implied by recognizing an equity in the preferred stockholders, according them the right of management and control and deferring the notes for definite terms. On the contrary the record clearly establishes that the Vincent Committee through Mr. Rhodes took the position that the company was insolvent and that neither the common nor preferred stockholders had any equity. Standing firmly in that position they at all times insisted that the assets should be given to the noteholders through stock issuance and that all others should be entirely excluded from interest or control. They adhered consistently and firmly to that position throughout the entire proceedings and they were defeated by the action of the parties in interest and by the court's rulings.

They participated in a hearing in the District Court on June 20, 1939, on the question of retaining Mr. Hoffman, president of the company and Additional Trustee, as operating head of the business. The other parties, including the stockholders' committee, approved the Trustee's proposal to retain Mr. Hoffman, but consistently with their belief that the company was insolvent and that the control and management should be taken away from stockholders and be vested in the noteholders, the Vincent Committee, through their attorneys, vigorously objected to and opposed it.

On October 12, 1939, they filed a petition for a hearing on the valuation of the Debtor's assets, stating in the petition their belief that the Debtor was insolvent. They prayed as follows:

"Wherefore, your objectors pray that the Court may, following the hearing on the plan of reorganization filed by Thornton Cooke, as Trustee herein, enter appropriate orders in all things denying the request of Thornton Cooke, as Trustee, that his proposed plan be approved by this Court, and further find that no plan can be a fair, equitable and feasible plan which does not in its requirements and provisions provide for the holders of the 6½% Gold Notes of the Debtor only, and find that the preferred stockholders of the Debtor and the common stockholders of the Debtor have no interest therein, for the reason and on the ground that the property and assets of the Debtor and its probable earning capacity are such that there is no equity over and above the indebtedness of the Debtor as represented by the Gold Notes and accrued interest thereon, and, therefore, such preferred and common stockholders are not, under the law, entitled to participate in the reorganization of the Debtor.

"Your objectors further pray that this Court find the Debtor to be insolvent, and that the Debtor does not have assets and property sufficient to discharge its obligations." Hearing was had on the Vincent Committee's petition for evaluating the assets in connection with the hearing on the plans for reorganization. On the hearing as to valuation, various experts testified in support of the valuation of $3,200,000, made by the Trustee, and the court found in accordance with it. Consideration of the testimony adduced and cross examination con-

ducted by Mr. Rhodes compels concurrence in the declaration made by the District Court that "There was no substantial countervailing proof".

In the course of the same hearing, Mr. Rhodes stated, among other things: "If it please Your Honor, I think it is desirable I express to you now, representing the Vincent Committee, a holder's committee, the complete divergence of thought between the committee and the Trustee, so that Your Honor may appropriately follow whatever cross-examination or evidence we have on that."

Mr. Rhodes then stated that the Trustee had proceeded on the assumption of solvency as had all committees other than the Vincent Committee and that the hearing would turn on the question of solvency or insolvency. He concluded his opening statement as follows: " * * * I would like to have Your Honor bear with us because we are so thoroughly convinced it is insolvent that it must be developed, and as Your Honor knows a different principle of law applies to solvency or insolvency."

Later in the hearing Mr. Rhodes, while cross-examining the Trustee, indicated his position that the Debtor should be liquidated, saying: "I want to show that this debtor as an economic unit had no excuse for existing whatever when it was put up and hasn't had since then. That is what I want to show. It isn't strategically located or anything else."

Mr. Crane, attorney for the Debtor, interposed: "The debtor is the one trying to live. You are perhaps trying to kill it off, but we are trying to live.

"Mr. Rhodes: You have already killed yourself."

Later in the hearing, but while Mr. Rhodes was still cross-examining the Trustee, he engaged in the following colloquy with Mr. Crane, counsel for the Debtor:

"Mr. Crane: You are seeking now to break down the Trustee's plan?

"Mr. Rhodes: Exactly.

"Mr. Crane: As ground for introducing your plan?

"Mr. Rhodes: That is right.

"Mr. Crane: To substitute your plan? You are trying to break it at every point you can?

"Mr. Rhodes: Yes."

While William P. Hemphill, a witness for the Jones or Merged Committee, was on the stand, there was colloquy between the court and Mr. Rhodes as follows:

"The Court: I take it now since there is an agreement there is no longer objection to that particular part of the plan.

"Mr. Dyer: Very well. I did not realize there was.

"Mr. Rhodes: There is no agreement on our part.

"The Court: No I understand, no agreement on your plan.

"Mr. Rhodes: No, no agreement on our plan. But there is no agreement on our part as to the plan. We object to the whole plan."

In another argument to the court, Mr. Rhodes said: " * * * Well, under our thought, it [the Debtor] should be now liquidated. That is true. Under our thought that it is insolvent, it should be liquidated. We don't propose to present liquidation in this proceeding. What we do propose is, since it is insolvent, nobody has made claim on it except the noteholders themselves, and to keep from the disadvantage of selling them on the curb now, and since it has to be turned over in some form, a company should be organized and common stock issued to them as their interest appears, as they hold the notes, and turned over to them, they can come in the next day and liquidate it if they like; they don't have to until the day following, they are then in the full possession of the company, which they may operate, liquidate or sell as they please, but they may handle it in an orderly way without loss. It should be liquidated in that sense, our whole argument leads to that, and that is the stand we boldly take. There isn't any doubt about that. If there is any doubt in anybody's mind you ought to disabuse it."

After the hearing the Vincent Committee caused a letter to be sent out to noteholders which contained the following, i.a.: "It was and is the belief of the Vincent Committee that Flour Mills of America, Inc., is insolvent. The Vincent Committee filed a plan of reorganization under the terms of which the noteholders would acquire the whole property, to the exclusion of all others. Upon the trial of the issues framed in the case in the United States District Court, covering a period of a week, the Vincent Committee vigorously opposed the Independent Trustee's plan of reorganization on the ground that it proposed to give to preferred stockholders a large part of

the assets and a large voice in the management, when in fact they could have no interest, inasmuch as, as claimed by the Vincent Committee, the company was insolvent. All other noteholders' committees, and the preferred stockholders' committee, with some slight amendments suggested by them to the Trustee's plan, urged upon the court the adoption of the Trustee's plan."

There is no room to argue against the foregoing oral and written declarations of counsel that appellees were consciously making any contribution to the kind of a plan of reorganization that was finally effected. They wanted the company liquidated in the sense of being turned over through stock issued to their clients. Their statement, "That is the stand we take boldly", fairly justifies an inference that the speaker was conscious of the effect upon an allowance of compensation out of the estate in case of defeat and they were defeated by the subsequent action of the parties and the court.

Appellees insist upon our considering particularly two of the important services they rendered.

First in respect of the valuation. Although as they say they did not initiate any hearings (and therefore ought not be charged with delaying) they did file a petition for a valuation of assets and actively endeavored on the hearing of the petition to obtain a finding of insolvency. The book showing at the commencement was $6,015,681.80, Arthur Young and Company and Homer and Wyatt had later estimated it at $5,099,155.55, the valuation found by the court and put in the plan was $3,200,-000. But that final figure was substantially the same as the Independent Trustee had arrived at and had proposed. The appellees wholly failed in their attempt to establish insolvency.

After full consideration of all that appellees have presented concerning their activities in respect to valuation, we are unable to find therein any specific services contributing to the plan. On the contrary, they brought out "no substantial countervailing proof" against the Trustee's findings and the ultimate effect of their efforts was simply obstructive.

The second matter is in respect to the recognition in the effected plan of the total interest accumulated upon the gold notes at the rate of six and one-half percent. The Trustee undoubtedly hoped for and sought to eliminate the burden of the interest in the reorganization, but the record shows that long before the court had made its finding that the Debtor was solvent the court was persuaded, and had committed itself to the position, that in the absence of consent by noteholders they were entitled to the full amount of their claims, including interest. Counsel for the Archer Committee had stated his committee's position to be that the accrued interest was as much a part of the indebtedness as were the notes. In response to a request to be heard on the matter, the court had said, "I will, but it is a question I don't think has two sides to it". There is nothing to indicate that the court had ever wavered on the point. The committees, other than the Vincent Committee, though positively asserting the right of the noteholders to the interest, were apparently willing to consent to mitigation in the interest rate in order to further and contribute to the consummation of the plan. Under the circumstances the Vincent Committee's insistence through its counsel upon all the interest was not in the nature of a service contributing to the plan confirmed. At the utmost it was equivocal and may just as well have been part of "trying to break it at every point they could." It was consistent with their attempt to have the company put in the hands of noteholders to be liquidated if they saw fit.

Much that has been said or quoted is closely connected with the question whether the appellees rendered services which were beneficial in the administration of the estate within the statute. Mr. Hoffman was the head of the operating end of the business during administration and there is no proof of any services to him. The important problems that called for solution through the court were referred to the Commission for advisory opinion. Some delays resulted from that course which was always insisted upon by appellees, but lapse of time is a constant factor exerting pressure in such proceedings, and that appellees caused delays should not be unduly stressed. Some sales of unused or unnecessary property were made over the resistance of the appellees. We fail to find any specific service of appellees that was of important benefit in the administration or that made any large saving of cost or expense to the estate.

The court found that the Vincent Committee had "apparently" influenced the security holders represented by it to accept

the Trustee's plan. Aside from the fact that these appellees do not appear to have been in personal contact with noteholders, we think the court's qualification of its finding by the word "apparently" deprives it of the weight which we must accord to a positive finding of a fact.

Appellees have urged that attorneys' services have been found compensable within the statute even in cases where the attorneys have not been proponents of a plan but have contributed by objecting to plans proposed by others, or by aiding to bring out facts or to obtain rulings so that in truth they did "contribute to the plan confirmed." Teasdale v. Sefton Nat. Fibre Can Co., 8 Cir., 85 F.2d 379, 382, 107 A.L. R. 531; Straus v. Baker Co., 5 Cir., 87 F.2d 401, 407, 408, 409; In re Consolidated Motor Parts, Inc., 2 Cir., 85 F.2d 579; Sartorius et al. v. Bardo et al., 2 Cir., 95 F.2d 387; In re Celotex Company, D.C., 13 F. Supp. 1011; In re Memphis Street Ry. Co., 6 Cir., 86 F.2d 891, 894; In re Milwaukee Lodge No. 46 of Benevolent and Protective Order of Elks of United States, 7 Cir., 83 F.2d 662, 663, 665.

11 U.S.C.A. § 643 expressly provides that such attorneys' services may be compensable even when they are rendered "in connection with objections by them to the confirmation of a plan, or in connection with the administration of the estate." But our holding is that services are not compensable when, as Mr. Rhodes stated the fact to be in this case, the attorneys were trying to break up the plan at every point they can, or where, having endeavored throughout to accomplish substantially a liquidation for the exclusive benefit of their own note holding clients, they have failed in their efforts, and a reorganization recognizing the right of the stockholders to the management and funding and deferring the note indebtedness has been accomplished.

In the memorandum of the court passing on appellees' application for allowances it is stated that the recommendation of the Commission [that appellees be allowed $8,500 and expenses, $522.91] "should be accepted" and that "in the suggestion made by the Securities and Exchange Commission that Mr. Rhodes rendered beneficial services in the reorganization, even by his opposition at times, there should be and is acquiescence". As it is the exclusive function of the court and not of the Commission to make the findings, conclusions and allowances, this form of expression should not be substituted for outright, clear declaration by the court of its own judgment. Any such are lacking in the record, but assuming sufficiency of findings, we think it is clear that the amounts allowed would have been adequate to compensate for the whole of appellees' 125 days of service if all of it had come within the statute, which it obviously did not. The award was upon the record here presented manifestly far beyond the limits of judicial discretion.

We are mindful that proceedings in reorganization extending over twenty months may confront attorneys and the court with circumstances, questions of law and fact and problems difficult to picture completely in the appellate court. But where, as in this case, the documentary evidence and the transcript of proceedings carried on orally clearly establish that counsel seeking compensation have clearly and unequivocally committed themselves to a position of opposition and hostility to a plan of reorganization, insisting on its disapproval "in all things", and have devoted all their efforts to maintaining that position, they can not be held to have contributed to the plan after it has been adopted and confirmed. Although it is true that the plan proposed by the Trustee was amended in many respects, there is no substantial evidence that the amendments were proposed or contributed to by appellees, and it is clear that the work done by the appellees delayed and increased the cost of the reorganization proceedings. We conclude that there were no compensable services performed by appellees for which the District Court could in its discretion award compensation to appellees out of the estate of the Debtor, nor could their expenses be reimbursed from that source.

Though our opinion is adverse to the compensability of appellees' services out of the estate of the Debtor, there is no thought or intended suggestion of criticism as to the quality or extent of the appellees' professional services to their clients.

The order appealed from is reversed with direction to disallow the claims.