**LONDON et al. v. SNYDER.**

**KOPLAR v. HEMKER.**

Nos. 13484, 13485.

Circuit Court of Appeals, Eighth Circuit.

Sept. 5, 1947.

J. L. London, of St. Louis, Mo. (Robert T. Burch, of St. Louis, Mo., on the brief), for appellants.

Forrest Hemker, of St. Louis, Mo., pro se (Greensfelder, Hemker & Wiese, of St. Louis, Mo., on the brief), for appellees.

Leo J. Powers, of Chicago, Ill. (Roger S. Foster, Sol., of Philadelphia, Pa., Thomas B. Hart, Regional Adm'r, of Chicago, Ill., and Aaron Levy, of Philadelphia, Pa., and G. Gale Roberson, Attys., Securities and Exchange Commission, of Chicago, Ill., on the brief), for Securities and Exchange Commission.

Before SANBORN, JOHNSEN, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

These are appeals from orders allowing and denying compensation to counsel for services in the proceedings for reorganization of The Congress and Senate Company, a Missouri corporation. Chapter X of the Bankruptcy Act, 11 U.S.C.A. §§ 501, 641, 642. In No. 13,484, appellants, attorneys for a holder of bonds of the debtor corporation, asked $15,000 for their services and received nothing. In No. 13,485, counsel for the trustee asked and was allowed $25,000

for his services, excluding however any allowance for services in connection with these appeals and any allowance for services with regard to the tax liability of the debtor which may arise with respect to the assessment of a proposed income tax deficiency against the debtor. In this case the creditor, represented by the appellants in No. 13,484, has appealed. The Securities and Exchange Commission was a statutory party in the proceedings in the bankruptcy court. It appears here as an appellee in No. 13,484.

The Congress and Senate Company was created in 1937 in the consummation of a 77B, 11 U.S.C.A. § 207 plan of reorganization of the Koplar Company, its predecessor in ownership and operation of the properties involved in this proceeding. The debtor's assets thus acquired were two related apartment properties in St. Louis, known as the Congress, containing 154 apartments and 7 shops, and the Senate, containing 30 apartments and with an 80-car garage in the basement. On the acquisition of title by the debtor these properties were encumbered by an issue of debtor's first mortgage registered income bonds dated May 25, 1937, maturing December 1, 1944, in the aggregate amount of $1,795,000, issued by the debtor pursuant to the plan confirmed in the Koplar reorganization for exchange for a like amount of outstanding bonds of the Koplar Company. At the time of the institution of these proceedings on November 20, 1944, of the bonds of the debtor there were outstanding the principal amount of $1,510,100, on which interest of 1½ per cent was delinquent. There were no other secured creditors of the debtor and no unsecured creditors except the holders of accounts for current operating expenses, all of which were paid shortly after the appointment of the trustee.

Pursuant to the plan confirmed in the Koplar Company reorganization the no par value common stock of the debtor was issued to voting trustees and deposited with a designated depositary, Boatmen's National Bank of St. Louis. Voting trust certificates for 17,950 shares of stock were issued at the rate of one share for each $100 principal amount of debtor's bonds, attached to the bonds, and designated Series A. Voting trust certificates for 26,531 shares of stock were issued to the prefered stockholders and general creditors of the Koplar Company and designated Series B. When this proceeding began there were outstanding Series A voting trust certificates representing 15,101 shares of stock, attached to debtor's outstanding bonds. All of the Series B voting trust certificates were outstanding. The stock trust agreement of the Koplar plan provided that, upon default in payment of debtor's bonds, the voting trustees should distribute the stock held for the benefit of the holders of Series B voting trust certificates to the holders of the debtor's then outstanding bonds, and that the rights of the holders of Series B certificates in or to the capital stock of the debtor should cease, and that such certificates should be of no further force or effect.

In its petition the debtor alleged that it did not have sufficient funds and no means of procuring sufficient funds with which to pay its outstanding bonds maturing on December 1, 1944, that it was threatened with foreclosure of its properties, and that it was then impossible to realize the full value of the properties by a sale or in any manner other than by the debtor's reorganization. The petition was approved on the day on which it was filed, and a trustee was appointed to take debtor's properties and continue their operation. The properties of the debtor were appraised at $1,097,000.

No suggestions concerning the reorganization of the debtor were received from creditors by the trustee within the time fixed by the court. The plan proposed by the trustee, filed June 18, 1945, was essentially a replica of the old Koplar plan. As in the Koplar reorganization the plan proposed by the trustee provided for a new corporation to take the debtor's properties and to issue its first mortgage registered income bonds in the aggregate amount of $755,050 (50 per cent of debtor's outstanding $1,510,100 bonds), the bonds to bear 5 per cent cumulative initial interest and an additional 3 per cent noncumulative interest, if earned, after the payment of

$45,000 a year into a sinking fund for amortization. Debtor's old bondholders would receive $50 in bonds of the new company for each $100 in bonds of the debtor, and, in addition, one share of $1 par value common stock of the new company for each $100 par value of the old bonds. The stock of the new company was to be held in a 20-year voting trust, subject to termination by 60 per cent of the new company's bondholders and stockholders. A sale of the stock or the mortgaged properties was subject to veto by the holders of 25 per cent of the stock.

At the hearing on plans in August 1945 the court had before it two other plans proposed by bondholders who objected to the trustee's plan. Of these, the Nat Koplar plan was in substance a bid to purchase debtor's assets by a new corporation controlled by Koplar and his associates, in exchange for $300,000 in cash and first mortgage 4½ per cent bonds of the new corporation in the principal amount of $755,-050, maturing in 15 years. The other, the Ruppa plan, likewise provided for a new corporation to acquire debtor's assets and to issue its first mortgage bonds in an amount equal to the outstanding bonds of the debtor, bearing interest at a fixed rate of 3 per cent and 3 per cent additional interest, if earned, and exchangeable bond for bond for debtor's bonds, the debtor's bondholders to hold the stock of the new corporation.

At this hearing the only evidence of the value of debtor's assets was the March 1945 appraisal. On the faith of this valuation, the court found that the fair market value of the assets of the debtor was less than its aggregate liabilities; that the debtor was insolvent under the Bankruptcy Act; that the capital stock of the debtor and voting trust certificates representing capital stock had no value; that the holders of the capital stock and voting trust certificates were not entitled to participate in the plan of reorganization; and that their acceptance of the plan was not required.

The court approved the trustee's plan, but it was immediately apparent that the required acceptances from the bondholders could not be secured. One of the most vigorous objectors to the trustee's plan was Ruppa, who organized a bondholders' committee which eventually represented $307,-200 of debtor's bonds. Another objector was Nat Koplar and his associates, who, in addition to bonds originally held by them, ultimately acquired by purchase at par bonds of the Sam Koplar group in the amount of $367,800. Others objecting to the trustee's plan were the Real Estate Management Company and Elizabeth Miller, owners of $25,000 of the debtor's bonds; and Julia Jacoby, owner of $5,000, who later filed a plan of reorganization.

On December 1, 1945, Nat Koplar made another bid for the acquisition of the debtor's properties, in the form of a plan calling for the organization of a new corporation to be wholly owned by Nat Koplar and his associates, the new company to pay in cash to the debtor's bondholders 70 per cent of the principal amount of their bonds, and to execute its second mortgage for the remaining 30 per cent, the second mortgage to follow a first mortgage of the Koplar controlled company in the amount of $800,000. Later in the same month this plan was amended by the Nat Koplar group to increase the cash to be paid by the new Koplar Company to debtor's bondholders from 70 per cent to 75 per cent and to reduce the second mortgage correspondingly. This group also proposed an alternative plan which provided for the transfer of debtor's properties to a new company to pay debtor's bondholders in cash 22 per cent of the par value of the old issue and deliver its new first mortgage 20-year 4 per cent bonds for the remaining 78 per cent.

Eventually, the certainty that the required acceptances on the part of bondholders could not be secured for the trustee's plan and a rising real estate market brought about an amendment of the trustee's original plan and the reappraisal of debtor's properties. The reappraisal as of January 1946 fixed the value of debtor's properties at $1,300,000. The trustee's plan was amended to increase the amount of the new bond issue to 70 per cent of the outstanding bonds of the debtor, or $1,057,070.

After the proposal of the trustee's amended plan, the Sam Koplar group, which at this time had not disposed of its bonds, negotiated an amendment of the trustee's amended plan whereby Sam Koplar guaranteed to purchase from all of the debtor's bondholders who desired to sell their bonds and stocks, the bonds at par and the stock at $20 per share. The net result of this amendment was that bondholders of the debtor who so desired could cash their new securities to yield 90 per cent of the face of their holdings.

The trustee's amended plan was opposed by Nat Koplar, the Ruppa Committee, and the Real Estate Management Company. Nat Koplar in March 1946 made his final bid for the debtor's properties in the form of a plan wh'ch provided for the transfer to Nat Koplar and his associates of all debtor's real and personal property, except cash, upon the payment to debtor's trustee of the full face amount of debtor's outstanding bonds. This plan was approved by the court on March 27, 1946. It received the required acceptance from debtor's bondholders and was confirmed on June 17, 1946.

On August 1, 1946, the transfer of debtor's assets to the new company organized by Koplar and his associates was completed. Distribution of 93 per cent of debtor's outstanding bond issue was made to the holders of its bonds, leaving cash in the hands of the trustee in the sum of $234,405.34 at the time of the hearing for allowances of compensation at which the orders now under consideration were made. The total allowance for compensation made by the court was $65,300. There remained outstanding fixed liabilities of $189,291.04, made up of the principal amount of 7 per cent of debtor's bonds and interest; further compensation to trustee's counsel for services rendered on appeals from compensation orders and concerning any tax liability of the debtor; and a potential liability of $60,000 to the United States for taxes accruing during the trustee's operation of the debtor.

The following are typical cases in this and other Federal courts in which the rules controlling courts of bankruptcy in allowing or denying compensation in reorganization proceedings and in fixing the amount of compensation allowed and the considerations which govern an appellate court on appeals from such orders are stated. Teasdale v. Sefton Nat. Fibre Can Co., 8 Cir., 85 F.2d 379, 381, 107 A.L.R. 531; Silver v. Scullin Steel Co., 8 Cir., 98 F.2d 503, 505; Stark v. Woods Bros. Corp., 8 Cir., 109 F.2d 969, 972; Greensfelder v. St. Louis Public Service Co., 8 Cir., 114 F.2d 53, 60, 62; Cooke v. Bowersock, 8 Cir., 122 F.2d 977; Stein v. Hemker, 8 Cir., 157 F.2d 740; Oklahoma Ry. Co. v. Johnston, 10 Cir., 155 F.2d 500; In re Mt. Forest Fur Farms of America, Inc., 6 Cir., 157 F.2d 640; In re Detroit International Bridge Co., 6 Cir., 111 F.2d 235; Woods v. City Nat. Bank & Trust Co. of Chicago, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820. All of the decisions agree that, if the purpose of Chapter X of the Bankruptcy Act, the rehabilitation of corporations in financial distress, is to be realized, the administration of the debtor's estate must be conducted with the strictest economy. Allowances for counsel for trustees and creditors must be moderate, not only in the interest of debtor and creditors, but in the public interest as well. Counsel who represent the interests of particular creditors, as distinguished from the interests of the estate in administration, are not entitled as of right to be compensated out of the estate, even though their services result in benefit to the estate. By the plain terms of the Act the judge may, but is not required to pay counsel for creditors from the assets of the estate. The allowance of compensation to counsel for creditors is always in the sound discretion of the bankruptcy court, and orders allowing or denying compensation or in fixing the amount of compensation allowed will be disturbed only upon the clear showing that the order appealed is so opposed to right and reason as to show an abuse of discretion. The amount of compensation allowable in the court's discretion is not measured by the amount which counsel would have received for the same services in private employment. Compensation allowed others in the same proceeding or in other reorganizations affords little or no evidence of the reasonableness or reverse of an order of allowance under review on appeal.

■ Applying the rules just stated to the claim of appellants in No. 13,484, we conclude that the order appealed from must be affirmed. In this case we are not concerned with whether the bankruptcy court, in the exercise of its discretion, might have allowed appellants some compensation, but only with the question whether, in denying compensation, the bankruptcy court has, on the evidence before us, abused the discretion vested in it by the Act. In denying compensation to appellants the court found that appellants were acting primarily, if not exclusively, for the benefit of their clients, the Nat Koplar group. The court further pointed out that the so-called plans which this group presented from time to time were in reality bids for the acquisition of debtor's properties on terms satisfactory to the bidders, and that necessarily the interest of counsel's clients, as bidders for the properties of the debtor, was to acquire them on the best terms possible, and therefore in conflict with the interests of the debtor and its other creditors. There was ample evidence before the court to support its conclusion.

In No. 13,485 the question presented differs in that counsel for the trustee is, under the evidence, entitled to moderate compensation for his services. The particular question here is whether, on the evidence before us, the amount allowed so far exceeds the maximum permissible as to constitute an abuse of the court's discretion.

Counsel asked and was allowed $25,000 for 757 hours devoted to the reorganization proceedings and for all remaining services of a general administrative character necessary to the final consummation of the plan of reorganization, but not including the services to be rendered by counsel on appeals from compensation orders and in litigation of a possible difficult and intricate tax question.

Appellee was employed as counsel for the trustee on May 5, 1944. The hearing on compensation was heard on November 13 and 14, 1946. It is apparent from the record that during this time appellee was engaged in other law practice, and particularly for some five or six months was trustee and counsel in another reorganization proceeding strikingly similar to this one. In the present reorganization the debtor was indebted only to its stockholders. Persons who owned and controlled the debtor corporation also owned and controlled all of its outstanding obligations. The reorganization of the debtor, if the situation stated was appropriate for a resort to bankruptcy, should have been and was, as the appellee stated at the hearing, a routine one-class-creditor reorganization, requiring neither exceptional legal ability nor astuteness in financial affairs. The proceedings terminated in the foreclosure of the debtor's properties, a result which ostensibly it was instituted to avoid. Whether the creditors will receive the face value of their bonds with interest is extremely doubtful, and it is still an open question whether debtor's creditors are in better financial position by reason of the reorganization than they would have been today if the properties which they owned had been delivered to them at the outset as the Ruppa Committee proposed.

■ Undoubtedly appellee devoted more time to the reorganization than ordinarily would have been required. This was due to the fact that the trustee appointed in November 1944 accepted an appointment with the United States in April 1945, which required his extended absence from St. Louis. The inability of the trustee in these circumstances to give close personal attention to the reorganization was one of the grounds for the appointment of appellee as counsel. But it appears from the record that the trustee has been liberally compensated by the estate. Whatever time his counsel devoted to the reorganization in negotiations within the province of the trustee due to the absence of the trustee is not, under these circumstances, compensable at the expense of the estate. We conclude that the allowance made to appellee was excessive by $12,500.

The order in No. 13,484 is affirmed. The order in No. 13,485 is reversed, with directions to allow appellee $12,500 for the services specified in the order appealed from.